FILED
CLERK, U.S. DISTRICT COURT

JAN - 8 2004

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1

2

3

4

5

6

7

8

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AHMAD HEYDAR, | ) | CV 03-2541 SVW (MANx) |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANT |
| v. | ) ) | WESTPORT INSURANCE CORPORATION'S MOTION FOR |
| WESTPORT INSURANCE CORPORATION, and Does 1-50, inclusive, | ) ) ) | SUMMARY JUDGMENT |
| Defendants. | ) ) | |

DOCKETED ON CM

JAN - 9 2004

BY _____ 012

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**I. INTRODUCTION/FACTUAL & PROCEDURAL HISTORY**

Originally filed in California Superior Court on March 7, 2003, this action seeks damages, indemnification, and declaratory relief. This action primarily concerns the question of whether Defendant Westport Insurance Corporation ("Westport") has a duty to defend Plaintiff Ahmad Heydar ("Heydar") in another lawsuit that has been brought in state court ("underlying lawsuit").

Heydar is a licensed structural engineer who purchased two professional liability insurance policies from Westport, one for 2000-01 and a second for 2001-02. In 1997, Heydar prepared structural engineering drawings for a house, which was built in 1999 and 2000 using his plans. On May 30, 2001, following a rainstorm during which water entered the house, Ronald and Doreen Topper ("Toppers"), to whom



1   Heydar had sold the house in 2000, filed a complaint ("original
2   complaint") in California state court alleging various causes of
3   action against Heydar and other defendants involved in the
4   construction and sale of the Topper residence.  Heydar, apparently
5   believing the original complaint made no allegations of professional
6   structural engineering negligence and instead focused on faulty
7   construction and installation of windows and sliding glass doors,
8   tendered the original complaint to his general commercial liability
9   carriers rather than to Westport, his professional liability carrier.
10  (Heydar Uncontroverted Facts ¶ 42.[1])

11      While repairing the water damage, the Toppers discovered
12  professional structural engineering defects.  They communicated
13  allegations of these defects to Heydar in January 2002, and on January
14  23, 2002, Heydar first reported the Topper suit to Westport.  On March
15  20, 2002, the Toppers filed an amended complaint that Heydar contends
16  for the first time included a cause of action for professional
17  structural engineering negligence against him.

18      Heydar sought coverage under his insurance policy from Westport,
19  but Westport denied this coverage.  As a result, Heydar filed this
20  action for breach of contract, insurance bad faith, and declaratory
21  relief in state court on March 7, 2003.  Westport filed a Notice of
22  Removal pursuant to 28 U.S.C. § 1441 on April 10, 2003.  This Court
23  has original diversity jurisdiction under 28 U.S.C. § 1332.

24

25

26  [1]    Heydar says he believed he had commercial general liability
27  coverage, either directly or as a named additional insured.  For
    example, he thought he was a named additional insured on the
28  insurance policy of the general contractor who built the house
    and would be defended under that policy.  Heydar Decl. ¶ 9.

1   On June 23, 2003, Westport filed a Motion for Summary Judgment

2   seeking a ruling that coverage is not available to Heydar in the

3   underlying lawsuit.  On July 7, 2003, Heydar filed his Opposition to

4   Westport's Motion for Summary Judgment as well as a Cross-Motion for

5   Summary Adjudication on Defendant's Duty to Defend and Defendant's

6   Duty to Indemnify in the underlying case.  Along with these pleadings,

7   Heydar filed a Response to Westport's Statement of Uncontroverted

8   Facts as well as declarations in support of the facts Heydar alleged.

9   On July 30, 2003, Westport filed a Motion to Stay the action until the

10  underlying lawsuit was resolved.  And on August 29, 2003, in light of

11  the facts alleged in Heydar's July 27, 2003 filings, and the purported

12  necessity for additional discovery to which they gave rise, Westport

13  filed an Ex Parte Application for Additional Time to file its reply to

14  Plaintiff's opposition and its opposition to Plaintiff's Cross-Motion

15  for Summary Adjudication.  On September 3, 2003, Heydar withdrew the

16  duty to indemnify issue from his Motion for Summary Adjudication.  The

17  Court denied the Ex Parte Application for Additional Time at a hearing

18  on September 9, 2003.  The Court held a hearing on Westport's Motion

19  for Summary Judgment on September 29, 2003, at which time the Court

20  took the matter under submission.  On October 15, 2003, the Court

21  ordered further briefing on several matters.  The Court, having

22  considered all the briefing, and for the reasons set forth below, now

23  GRANTS Westport's Motion for Summary Judgment on duty to defend.

24

25  **II.   SUMMARY OF ARGUMENTS**

26  Westport seeks a ruling that coverage is not available to Heydar

27  in the underlying lawsuit because (1) Heydar breached the notice

28  provision of the 2000-01 Policy, which is a condition precedent to

1  coverage, and (2) no "claim" was first made against Heydar during the

2  effective dates of the 2001-02 Policy.

3      Heydar argues that he is entitled to coverage under the 2001-02

4  policy because he promptly reported what he contends was the first

5  claim of professional negligence against him.  Heydar also argues

6  that, even if the original complaint stated a claim for professional

7  negligence, it was a distinct claim from the one alleged in the

8  amended complaint such that the new claim is covered by the 2001-02

9  policy.  Alternatively, Heydar argues that if the Court should find

10 that the claim was first made during the 2000-01 policy period, Heydar

11 should be covered under that earlier policy because the notice-

12 prejudice rule should apply.

13

14 **III. DISCUSSION**

15     Westport denied coverage to Heydar because of Heydar's alleged

16 failure to report the Toppers' professional negligence claim when it

17 was made.  The insurance policies at issue in this case were "claims

18 made and reported" policies, meaning that the insured was covered for

19 any claims made against him and reported during the policy period.

20 The policies provided that "We shall pay on behalf of any insured all

21 'loss' in excess of the deductible which any insured becomes legally

22 obligated to pay as a result of 'claims' first made against any

23 insured during the 'policy period' and reported to us in writing

24 during the 'policy period' or within sixty (60) days thereafter, by

25 reason of any 'wrongful act' occurring on or after the 'retroactive

26 date', [sic] if any."  John Cummings Declaration ("Cummings Decl."),

27 Exh. A, at 5.  As a condition precedent to coverage, "if a 'claim' is

28 made against any insured, the insured(s) shall, as soon as

1 │ practicable, but no later than sixty (60) days after termination of

2 │ the 'policy period', [sic] provide written notice of the 'claim' to

3 │ us." _Id._ at 6.  Claim is defined as a "demand made upon you for loss,

4 │ including, but not limited to, service of suit or institution of

5 │ arbitration proceedings or administrative proceedings against you."

6 │ _Id._ at 9.

7 │

8 │     A.   2000-01 Policy

9 │     Westport argues that Heydar cannot receive coverage under the

10 │ 2000-01 policy because he did not report the claim within that

11 │ policy's reporting period.  While Heydar does not dispute his failure

12 │ to report the claim within the 2000-01 policy's reporting period, he

13 │ argues that the claim should still be covered under the 2000-01 policy

14 │ because of the notice-prejudice rule.  Under the notice-prejudice

15 │ rule, an insurer cannot avoid coverage based on the insured's failure

16 │ to provide timely notice unless that delay caused the insurer

17 │ substantial prejudice.

18 │     The California Supreme Court has not ruled on whether the notice-

19 │ prejudice rule applies to claims made policies.  However, a number of

20 │ other courts have considered this question.  In _Slater v. Lawyers'_

21 │ _Mutual Insurance Co._, 227 Cal. App. 3d 1415 (1991), the court held

22 │ that the notice-prejudice rule, developed for "occurrence" policies,

23 │ does not apply to claims made policies.  _Id._ at 1422-24; _but see_ _id._

24 │ at 1424 (Dissent of Johnson, J.) (citing cases applying the notice-

25 │ prejudice rule to claims made policies).  Occurrence policies, which

26 │ are used for identifiable events like collision, fire, and war, are

27 │ ill-suited for professional liability policies.  _Id._ at 1422-23.

28 │

1    Underwriters soon realized, however, that "occurrence"

2    policies were unrealistic in the context of professional

3    malpractice because the injury and the negligence that

4    caused it were often not discoverable until years after the

5    delictual act or omission.  In an effort to reduce their

6    exposure to an unpredictable and lengthy "tail" of lawsuits

7    filed years after the occurrence they agreed to protect

8    against, underwriters shifted to the "claims made" policy.

9    Id. at 1423, quoting Pacific Employers Ins. Co. v. Superior Court, 221

10   Cal. App. 3d 1348, 1357-58 (1990).  Under claims made policies, the

11   reporting of the claim is the event that triggers coverage.  Id.  In

12   Slater and Pacific Employers, as in this case, the policies were ones

13   in which "coverage does not attach unless the claim is made and

14   reported to the insurer during the policy period."  Pacific Employers,

15   221 Cal. App. 3d at 1357.

16       The Ninth Circuit, in Burns v. Int'l Ins. Co., 929 F.2d 1422 (9th

17   Cir. 1991), elected to follow Pacific Employers.  The court noted that

18   there was conflicting authority concerning the question of applying

19   the notice-prejudice rule to claims made policies.  Id. at 1425.

20   Nonetheless, the court found the Pacific Employers reasoning

21   persuasive because the California Supreme Court declined to review

22   Pacific Employers, and because applying the notice-prejudice rule

23   would rewrite claims made policies, which are less expensive to the

24   insured precisely because they reduce the insurance company's

25   potential exposure.  Id.

26       Other cases have found that the notice-prejudice rule applies to

27   claims-made policies.  For instance, in Northwestern Title Security

28   Co. v. Flack, 6 Cal. App. 3d 134 (1970), the court noted that the

6

California Supreme Court cases propounding the notice-prejudice rule
made no mention of such a distinction.  Id. at 143-44.  The Flack
court did not engage in a thorough analysis of the reasons for claims
made policies.  But in Helfand v. Nat'l Union Fire Ins. Co., 10 Cal.
App. 4th 869 (1992), a panel of the First District of the California
Court of Appeal, the same district that decided Flack, rejected Flack
and sided with Pacific Employers and Slater.  Helfand, 10 Cal. App. 4th
at 887-88.

Heydar attempts to distinguish this line of cases as being
primarily concerned that applying the notice-prejudice rule to claims
made policies would result in a free extension of the policy.  See
Slater, 227 Cal. App. 3d at 1423, citing Gulf Ins. Co. v. Dolan,
Fertig and Curtis (Fla. 1983).  The Slater court does note that the
plaintiff in that case had the opportunity to purchase an extended
reporting period endorsement, but he declined that offer.  Id. at
1424.  Heydar claims that the public policy that supports declining to
extend the notice-prejudice rule to most claims made cases does not
apply to him because he paid for extended coverage by purchasing a new
policy the following year.  Similarly, Heydar cites the language in
Pacific Employers that rejects that case's plaintiff's contention
that, if the notice-prejudice rule is not applied to claims made and
reported policies, then insureds will be forced to renew coverage:
"Insureds are not held 'hostage' by a 'claims made and reported'
provision.  An insured has the option of either purchasing another
'claims made' policy from the initial insurer to extend the period of
coverage, or purchasing a policy with retroactive coverage with
another insurer."  221 Cal. App. 3d at 1360.  Heydar claims that, by
extending the policy, he has done just what the Pacific Employers

1 | court suggested.  In addition, one of two reasons the Ninth Circuit

2 | stated in <u>Burns</u> for following <u>Pacific Employers</u> was that "[t]o apply

3 | the notice-prejudice rule to a claims-made policy would be to rewrite

4 | the policy, extending the policy's coverage at no cost to the

5 | insured."  <u>Id.</u> at 1425.

6 |     The Court declines to apply the notice-prejudice rule in the way

7 | Heydar has urged.  While there is an argument that the rationale for

8 | excluding claims made policyholders from the protections of the

9 | notice-prejudice rule falls away where the insured purchases extended

10 | coverage, the Court need not decide that question here because Heydar

11 | did not buy extended coverage. When Heydar purchased the second policy

12 | with Westport, he did not purchase an extended reporting period for

13 | his first policy; nor was he ever told that purchasing a second policy

14 | would havethe effect of extending his previous coverage.  The 2000-01

15 | policy only covered Heydar for claims that were made and reported

16 | during the policy period; Heydar failed to report the claim and, as a

17 | result, may not receive coverage.

18 |

19 |     B.   <u>2001-02 Policy</u>

20 |     Westport argues that Heydar cannot obtain coverage under the

21 | 2001-02 policy because no claim was made against Heydar during that

22 | period.  It is first necessary to determine whether the original

23 | complaint stated a claim against Heydar for professional negligence.

24 | If so, the Court must then decide whether the claim alleged in the

25 | amended complaint is related to the claim alleged in the first

26 | complaint such that failure to report the original complaint precludes

27 | coverage for the claim in the amended complaint.

28 |

1.   The Original Complaint

The first issue for resolution regarding coverage under the 2001-02 policy is whether the original complaint made a claim against Heydar under the insurance policy's definition of claim.  Considering the complaint on its face, it does state a claim against Heydar for professional negligence in his capacity as a structural engineer.  It is true that the original complaint does not use the specific words "professional negligence" against Heydar.  Nonetheless, there is sufficient language in the original complaint to indicate that such a claim was being made.  For instance, the original complaint alleges that "Heydar was involved in the construction and sale of the Topper Residence to Plaintiffs."  Original Complaint (OC) ¶ 2.  In addition, the original complaint alleges that "defendants Heydar, Farid, Rezai and Does 1 through 5, inclusive ..., and each of them, were ... , in some manner or fashion between them, ... developers, owners, contractors, subcontractors, architects, engineers, builders, and sellers of the Topper Residence."  OC ¶ 11.[2]  The complaint further alleged that "In the application for the building permit, Heydar represented ... that Heydar was acting as the architect or engineer for the construction of Topper Residence,"  OC ¶ 13; that the defect at issue arose from "deficiencies in the design, specification,

---

[2] The original complaint also indicated that it could be amended to make specific allegations as to liability for engineering defects:  "Plaintiffs are unaware of the precise and exact nature of the relationship between the Developer Defendants [including Heydar] and the part each played in the acquisition, design, planning, development, construction and sale of the Topper Residence, but when the true and precise nature of their participation and relationship become known, this pleading will be amended to reflect the same or it will be established at the time of trial, according to proof."  OC ¶ 11.

materials, planning, supervision, observation of construction, and/or development of the Topper Residence," OC ¶ 18; and that the Toppers "relied upon the skill, knowledge, and expertise of the Developer Defendants ... in their participation in the process of the design, planning, development, construction, and/or sale of the Topper Residence," OC ¶ 24.

Given these allegations, the Court concludes that the original complaint did state a claim for professional negligence. Heydar urges this Court to find otherwise on the basis of the apparent communications between Heydar (or Leila Nourani, his former counsel in the underlying lawsuit) and Robb Strom, the Toppers' attorney in the underlying lawsuit. Heydar says that Strom told him that "[Strom] believed the leaks were caused by negligent installation and defective products, referring to the windows and installation of the windows and sliding doors, and possibly defective products." Heydar Decl. ¶ 7. Similarly, in Strom's declaration, he notes that in the numerous conversations he had with Ms. Nourani in 2001 about the lawsuit, Strom at no time indicated that the Toppers were alleging any professional negligence against Heydar. Strom Decl. ¶¶ 3-5. Strom apparently believed that the water intrusion "was primarily[3] caused by both the negligent installation of windows and/or sliding doors, and by product defects of some of the sliding doors themselves," which "are not structural engineering issues." Id. at ¶¶ 4-5. This extrinsic evidence is insufficient to support the view that there was no claim for professional negligence in the original complaint; Strom never

---

[3] In stating his belief that the negligent installation of the windows and doors and product defects were the <u>primary</u> causes of the water intrusion, Strom does not eliminate the possibility that structural engineering negligence was <u>one</u> cause.

1   made any affirmative representations, either during the
2   contemporaneous conversations or in his after the fact declaration,
3   that the complaint did not allege professional negligence against
4   Heydar.  Furthermore, even if this evidence would tend to indicate
5   that the Toppers were not making professional negligence allegations
6   against Heydar in the original complaint, they are irrelevant to the
7   question of whether such a claim was made in the original complaint.

8        Westport argues that extrinsic evidence is inadmissible on the
9   question of whether a claim was made because the definition of the
10  word "claim" is unambiguous.  The policy defines "claim" as "a demand
11  made upon you for loss, including, but not limited to, service of suit
12  or institution of arbitration proceedings or administrative
13  proceedings against you."  Cummings Decl., Exh. A, at 9.

14       In <u>Hill v. Physicians & Surgeons Exchange of California</u>, the
15  Fourth District Court of Appeal found that extrinsic facts were
16  inadmissible to determine whether a claim had been made because the
17  claims-made policy language and the definition of claim were
18  unambiguous.  <u>Id.</u> at 6.  In that case, the underlying lawsuit involved
19  a patient who was unhappy with the surgery her insured doctor
20  performed on her shoulder.  Though the underlying plaintiff expressed
21  her dissatisfaction with her doctor, she did not file a lawsuit or
22  make any demand for compensation until after the insured doctor's
23  policy period expired.  As a result, no claim had been made and the
24  insurer had no duty to defend.  <u>Id.</u>  Similarly, because the definition
25  of claim in the Westport policy is unambiguous, extrinsic evidence is
26  inadmissible here to determine whether the Toppers' original complaint
27  stated a claim.

28

1    Heydar, however, argues that when Westport received his tender in

2  January 2002, Westport had an obligation to investigate whether there

3  was a potential for coverage.  According to Heydar, this obligation

4  included a duty to consider extrinsic evidence regarding whether the

5  FAC presented claims that were not in the original complaint.  Unless

6  Westport considered these extrinsic facts, it could not refuse to

7  defend Heydar against the allegations in the FAC.  It is well-settled

8  California law that "evidence extrinsic to the underlying complaint

9  can defeat ... a defense duty."  Montrose Chem. Corp. v. Superior

10 Court, 6 Cal.4th 287, 291 (1993).  Heydar contends that Montrose is

11 not limited to extrinsic evidence the insurer produces; rather, the

12 insured as well must be able to produce extrinsic facts that bear on

13 the defense duty.  Heydar notes a passage in Montrose where the court

14 said that insurers will not be obligated to defend based on the

15 insured's "mere assertions that coverage may exist ... because, as in

16 summary judgment proceedings generally, an insured cannot manufacture

17 a dispute on summary judgment, ipse dixit, by refusing to concede the

18 truth of a fact without adducing some evidentiary support for its

19 position."  6 Cal.4th at 300-01.  Heydar claims that this language

20 indicates that the insured would be able to present extrinsic evidence

21 to support his claim for coverage.

22    But these arguments do not go to the heart of the issue, which is

23 whether this evidence may be considered in determining whether a claim

24 was made in the original complaint.[4]  Montrose is a case about the duty

25

26 [4] Heydar's position also places an outrageous burden on the
   insurer.  In essence, Heydar argues that notwithstanding
27 allegations in the complaint that should have put him on notice
   that a claim for professional negligence was made, the defendant
28 was obligated to follow up to see if those claims were real.

1   to defend; as such, it does not control in this situation, where the

2   only question is whether the original complaint stated a claim for

3   professional negligence.  Where, as here, a claims based policy is at

4   issue, the determination of whether a claim is stated is far more

5   mechanical than the duty to defend determination.  The insurance

6   policy defines claim broadly and makes reporting a claim a condition

7   precedent to coverage for that claim.  The insured's role is to report

8   the claim, not to anticipate whether the insurer will owe a duty to

9   defend.

10      Heydar invokes the "Hobson's choice" with which he was faced as a

11   result of the duty to report a claim he felt Westport would not

12   defend.

13         Assum[e] Heydar is correct and there were, in fact, no

14         allegations of professional engineering negligence that

15         existed at the time of the original complaint.  According to

16         Westport, Heydar would have had to tender the claim even

17         though coverage would have ultimately been denied.  His

18         reward for reporting this non-covered claim would be to risk

19         increased premiums, or face the possibility that his policy

20         would not be renewed because he asserted a claim.

21   (Pl.'s Supp. Br. at 4.)  Heydar notes that Westport did, in fact,

22   refuse to renew his policy following the 2001-02 policy year.  In

23   other words Heydar, even if he recognized that the original complaint

24   stated a claim on its face, did not want to report a claim that,

25   because of the extrinsic facts of which he was aware, he believed

26   would ultimately be denied.  To be sure, such reporting does carry

27   risks.  But, by not reporting the claim, Heydar bore another risk -

28   that if the claim was in fact covered by his professional negligence

13

1   policy with Westport, he would not be able to obtain coverage unless

2   he reported the claim during the policy period.  Heydar chose not to

3   report the Toppers' original complaint; as a result, he cannot obtain

4   coverage for the claims made in that original complaint.  Heydar was

5   under no obligation to report the complaint to his insurer, but he

6   cannot receive coverage if he failed to so report.

7      Because the term claim is unambiguous, extrinsic evidence is

8   inadmissible to determine whether the original complaint made a claim.

9   In any event the extrinsic evidence proffered does not support

10   Heydar's position that no professional negligence claim was made.  The

11   original complaint made a claim against Heydar for professional

12   engineering negligence.

13

14       2.   First Amended Complaint

15      Even if there was a covered claim against Heydar in the original

16   complaint, it may be distinct from the claim in the amended complaint.

17   Westport, however, argues that the amended complaint states the same

18   claim for professional negligence that was stated in the original

19   complaint.  Alternatively, Westport argues that, even if the claims

20   are distinct, they are related such that they are treated as a single

21   claim under the policy.

22

23       a.   The two complaints make very similar allegations.

24      Westport argues that the amended complaint states substantially

25   the same allegations as does the original complaint.  As a result,

26   Westport argues, the amended complaint embodies the same professional

27   negligence claim as does the original complaint, a claim that was made

28

1   at the time of the original complaint.  Therefore, Heydar cannot

2   receive coverage under the 2001-02 policy.

3        Heydar contends that the amended complaint contains allegations

4   different from those in the original complaint because it, for the

5   first time, makes the following allegations against Heydar:

6   (1)  "Heydar acted as the structural engineer of record for the

7        construction of the Topper Residence."  (FAC ¶ 42.)

8   (2)  "[Heydar] prepared structural plans and calculations in

9        connection with his work as structural engineer."  (FAC ¶ 42.)

10  (3)  "By virtue of his role as structural engineer, Heydar owed

11       Plaintiffs a duty of care to act in accordance with the Building

12       Code and the laws of the State of California relating to

13       structural engineers."  (FAC ¶ 42.)

14  (4)  "Heydar failed to design and/or construct the structural

15       components of the Topper Residence in accordance with the

16       Building Code and the laws of the State of California ...,

17       omitting to use required 'hold downs,' and causing framing to be

18       insufficiently designed and constructed to carry the structural

19       loads placed upon it."  (FAC ¶ 44.)

20  (5)  "As a direct and proximate result of the breaches of duty of

21       Heydar ..., Plaintiffs ... have suffered damage[s]."  (FAC ¶ 45.)

22       Numbers (1), (2), and (3) are merely general allegations

23  regarding Heydar's role as structural engineer.  Though Heydar

24  disputes it, this Court has already determined that the original

25  complaint contained allegations of structural engineering negligence

26  against Heydar.  (See supra Part III.B.1.)  The original complaint

27  mentioned Heydar's role as engineer.  (See, e.g., OC ¶¶ 11, 13.)

28  Thus, the allegations in the amended complaint that Heydar was the

1  structural engineer of record and owed a duty as such add nothing to

2  the allegations in the original complaint.  Nor does number (5) add

3  anything new, as the original complaint alleges damages.  (See OC ¶¶

4  19, 26, 32, prayer.)

5       Thus, it is only number (4), with its allegations regarding hold

6  downs and framing, that could possibly say something new.  But

7  Westport argues that even these allegations merely restate those in

8  the original complaint.  Westport points to paragraph 18 of the

9  original complaint, which alleges that "the above-described defects

10 arose out of, or were attributable to, and are directly and

11 proximately caused by deficiencies in the design, specifications,

12 materials, planning, supervision, observation of construction,

13 construction, and/or development of the Topper Residence."  (OC ¶ 18.)

14 This language from the original complaint is similar to the language

15 in the amended complaint in that it discusses design and construction

16 deficiencies.  But the two complaints describe those design and

17 construction deficiencies differently.  The original complaint alleges

18 a number of defects arising out of the deficiencies, "including, but

19 not limited to, defects in windows and doors and the manner of their

20 installation, defects in exterior and interior finish work, defects in

21 deck installation and waterproofing, defects in exterior stucco,

22 defects in plumbing, defects in workmanship, and violations of

23 applicable building code provisions."  (OC ¶ 15.)  The amended

24 complaint, on the other hand, specifically refers to "omitting to use

25 required 'hold downs,' and causing framing to be insufficiently

26 designed and constructed to carry the structural loads placed upon

27 it."  (OC ¶ 44.)  While the two complaints contain different

28 specifics, these differences are largely insignificant because they

1   merely describe design and construction deficiencies differently.
2   Moreover, the Court need not conclusively decide this question because
3   even accepting the argument that the allegations in the amended
4   complaint differ from those in the original complaint, Westport must
5   prevail on two alternative bases:  the complaints assert only one
6   primary right, and the claims arise out of a series of related
7   wrongful acts.

8

9              b.    The two complaints state a single claim because
10                   only one primary right is invoked.

11        The seminal California case regarding whether multiple acts,
12   errors, or omissions constitute multiple claims or only a single claim
13   is Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5
14   Cal.4th 854 (1993).  In Bay Cities, an attorney had a professional
15   liability insurance policy that limited coverage to a maximum of
16   $250,000 "for each claim."  Id. at 857.  The plaintiff, Bay Cities,
17   was unable to collect money it was owed from a construction project.
18   The insured attorney filed a mechanic's lien, but failed to foreclose
19   the mechanic's lien or to serve a stop notice on the project's
20   construction lenders.  Id. at 858.  Bay Cities argued that these acts
21   gave rise to two claims for malpractice, but the court held that Bay
22   Cities had only one claim because the two acts of malpractice gave
23   rise to only one injury, Bay Cities' failure to collect what it was
24   owed.  Id. at 860.

25        Heydar notes the primary rights theory underlying the Bay Cities
26   holding.

27        California has consistently applied the primary rights
28        theory, under which the invasion of one primary right gives

                                    17

1  rise to a single cause of action.   Bay Cities had one

2  primary right - the right to be free of negligence by its

3  attorney in connection with the particular debt collection

4  for which he was retained.

5  Id. (internal citations and quotation marks omitted); but see id. at

6  873 (Kennard, J., concurring) (noting that the primary rights doctrine

7  concerns pleadings, which are different from insurance claims, and

8  that "the determination of rights under an insurance policy is a

9  question of contract law"). Heydar further argues that, while the

10 primary right at issue in Bay Cities encompassed both acts of

11 negligence by the attorney, the primary right was defined narrowly.

12 The primary right was not to be free of all negligence by the

13 attorney, but rather to be free of negligence in this particular debt

14 collection.  Thus, Heydar argues that the primary right in this case

15 should not be defined as broadly as the Toppers' right to be free of

16 structural engineering negligence in the construction of their home.

17    Heydar cites Winston Square Homeowner's Assoc. v. Centex West,

18 Inc., 213 Cal. App. 3d 282 (1989), for the proposition that

19 construction defects do not necessarily merge into one primary right.

20 In Winston Square, the plaintiffs were the owners of a townhouse

21 development who had suffered a number of construction defects, namely

22 drainage, plastering, gutters and downspouts, chimney crickets, valley

23 gutters, trim boards, and balcony railings.  Id. at 286.  The court

24 held a bifurcated trial, where the first part dealt only with the

25 question of statute of limitations.  Id.  The plaintiffs alleged that

26 the statute of limitations had been tolled by the defendant's attempts

27 to repair the defects.  Id.  The trial court held that the statute of

28 limitations had been tolled with respect to all but the drainage

18

1  defects.  Id. at 286-87.  On appeal, the plaintiffs challenged the

2  trial court's application of the statute of limitations to separate

3  areas of damage.  Id. at 287.  "Winston Square [plaintiffs] contends

4  it has one cause of action, for damages caused by the faulty

5  construction and design of the townhouse units, and the statute of

6  limitations must be applied uniformly to that single cause of action."

7  Id.  The plaintiffs invoked California's primary right theory and

8  argued that the defendant invaded only one primary right – the right

9  to homes and grounds free of defects.  Id.  The appellate court upheld

10  the trial court's finding, noting that "applying the definition of

11  'cause of action' strictly, one could probably set forth three causes

12  of action – one for drainage defects, one for defects causing water

13  intrusion in the townhouse units, and one for defective balcony

14  railings."  Id. at 289.  Thus, the primary right theory was not so

15  broad as to encompass every construction defect.  But neither was the

16  primary right theory so narrow as to designate a separate primary

17  right for each type of defect; e.g., plastering and gutters were not

18  two separate primary rights.

19      Here, Heydar argues that the two complaints assert different

20  primary rights as the original complaint was concerned only with water

21  damage, while the amended complaint makes allegations of vertical

22  loading defects.  But Heydar is reading in precision where there is

23  none.  The original complaint never says that it is only alleging

24  defects related to water intrusion.  Instead, it provides a

25  nonexclusive list of defects and problems that includes such generic

26  terms as "defects in workmanship" and "violations of applicable

27  building code provisions."  (OC ¶ 15.)  Moreover, the amended

28  complaint alleges that Heydar breached his duty of care "by failing to

1   design and/or construct the Topper Residence in a safe and workmanlike

2   manner." (FAC ¶ 44.) It is clear from this language that the primary

3   right being asserted by the Toppers in their amended complaint is the

4   right to a residence that was designed and constructed in a safe and

5   workmanlike manner. When read in context, it becomes clear that the

6   discussion of hold downs and framing is merely an explanation of the

7   ways in which Heydar failed to satisfy this primary right:

8          Heydar ... breached [his] duty of care by failing to design

9          and/or construct the Topper Residence in a safe and

10         workmanlike manner. Specifically, Heydar failed to design

11         and/or construct the structural components of the Topper

12         Residence in accordance with the Building Code and the laws

13         of the State of California pertaining to structural

14         engineers in a safe and workmanlike manner, instead omitting

15         to use required "hold downs," and causing framing to be

16         insufficiently designed and constructed to carry the

17         structural loads placed upon it.

18  (FAC ¶ 44.)   This same primary right was asserted in the original

19  complaint, which attributes the alleged defects, including defects in

20  workmanship and building code violations, to "deficiencies in the

21  design, specifications, materials, planning, supervision, observation

22  of construction, construction, and/or development of the Topper

23  residence." (OC ¶ 18).   Heydar's attempts to paint the original

24  complaint as one alleging water intrusion defects only and the amended

25  complaint as one for the first time focusing on vertical loading defy

26  the plain language of the two complaints, both of which contain fairly

27  general allegations that Heydar violated their right to a home

28  constructed in a safe and workmanlike manner.

1    Because the original complaint and the amended complaint assert

2    the same primary right, the two complaints state only one claim

3    against Heydar.  That claim was first made when the original complaint

4    was filed; therefore, Heydar cannot obtain coverage under the 2001-02

5    policy because no claim was first made against him during that policy

6    period.

7

8                    c.   <u>Alternatively, the claims arise out of a series of</u>

9                         <u>related wrong acts</u>.

10    Even if the Court had not found that the two complaints stated

11    only one claim, it would still be possible to treat the multiple

12    claims as one if they were related.  Condition J of the policy

13    provides that:

14         Two or more "claims" arising out of a single "wrongful act,"

15         or a series of related or continuing "wrong acts," shall be

16         a single "claim."  All such "claims" whenever made shall be

17         considered first made on the date on which the earliest

18         "claim" was first made arising out of such "wrongful act,"

19         and such "claims" are subject to one "Per Claim Limit

20         Liability" and deductible.

21    Thus, the relevant question is whether the claims arose out of a

22    single wrongful act or a series of related or continuing wrong acts.[5]

23         Heydar first argues that Condition J is inapplicable to these

24    facts because it only applies when multiple claims are made during the

25    same policy period.  Heydar cites <u>Homestead Insurance Co. v. American</u>

26    ─────────────────────

27    [5] The policy defines "wrongful act" as "any actual or alleged
     negligent act, error or omission in the performance of

28    'professional services' for others by an insured ...."  <u>Id.</u> at
     12.

                                   21

1  <u>Empire Surplus Lines Insurance Co.</u>, 44 Cal. App. 4th 1297 (1996)

2  extensively for this proposition.  In <u>Homestead</u>, the insured (Verdugo)

3  was sued for the same conduct in two different lawsuits.  The first

4  lawsuit, the Minnick suit, was filed during the policy period for a

5  claims made policy Verdugo had been issued by American Empire.  The

6  second lawsuit, the McLeod suit, was filed during the policy period

7  for a claims made policy issued to Verdugo by Homestead.  American

8  Empire refused to defend the McLeod suit, but Homestead defended it.

9  Homestead claimed that, because the American Empire policy included in

10  its definition of claim that "Claims arising out of the same act or

11  out of a series of interrelated acts shall be considered as arising

12  out of one negligent act, error or omission and shall be treated as a

13  single claim," the two lawsuits, which involved interrelated acts,

14  should be treated as a single claim under the American Empire policy.

15  <u>Id.</u> at 1303.  However, the <u>Homestead</u> court found that the claims made

16  nature of the policy, which provided that American Empire would only

17  pay for loss for which the insured became legally obligated to pay

18  "from any claim made against the Insured during the Policy Period,"

19  trumped the definition of claim to the extent that the definition

20  conflicted with the timing requirements.  <u>Id.</u> at 1305.  In reaching

21  this conclusion, the court relied heavily on the underlying rationale

22  for claims made policies, which is to allow insurers to predict "both

23  the limits of their exposure and the premium needed to accommodate the

24  risk undertaken."  <u>Id.</u> at 1304.

25      But Heydar fails to note a crucial difference between the policy

26  language in <u>Homestead</u> and the language here.  The language of

27  Condition J, unlike the related claims language in <u>Homestead</u>, speaks

28  directly to the timing of the making of the claim.  "All such 'claims'

1  whenever made shall be considered first made on the date on which the
2  earliest 'claim' was first made arising out of such 'wrongful act.'"
3  Thus, in agreeing to this policy language, the parties contemplated
4  that related claims, even if filed after the policy period, would be
5  considered first made at the time the earliest claim was made.  This
6  language would be nonsensical if interpreted to apply only to claims
7  made within the same policy period.  The precise date on which a claim
8  is made is of no consequence to anyone so long as that date falls
9  within the policy period.  Thus, there would be no policy language
10  discussing when a related claim was first made if it was not
11  contemplated that related claims made during different policy periods
12  would nonetheless be considered first made at the time of the earliest
13  claim.  Thus, Condition J is applicable to these facts and the Court
14  now turns to applying it.

15      In <u>Bay Cities</u>, the appellate court, unlike the California Supreme
16  Court after it, had determined that the plaintiff had, in fact,
17  asserted two claims.  5 Cal.4th at 866.  As a result, the dispositive
18  question for that court was whether the claims were "related" under
19  the policy, which provided that "Two or more claims arising out of a
20  single act, error or omission or a series of related acts, errors or
21  omissions shall be treated as a single claim."  <u>Id.</u> at 857, 866.  The
22  California Supreme Court considered this question as well, analyzing
23  whether the term related was ambiguous given the policy and the
24  circumstances, and whether related meant only causally related or also
25  encompassed logical relationships.  The court held that the term was
26  not ambiguous and that it was not limited to causal relationships.
27  <u>Id.</u> at 873.
28

1      The two errors by the attorney are "related" in multiple

2      respects.  They arose out of the same specific transaction,

3      the collection of a single debt.  They arose as to the same

4      client.  They were committed by the same attorney.  They

5      resulted in the same injury, loss of the debt.  No

6      objectively reasonable insured under this policy could have

7      expected that he would be entitled to coverage for two

8      claims under the policy.

9 Id. at 873.  Westport argues that this case mirrors Bay Cities.  Any

10 structural engineering claims arose out of the same transaction, the

11 construction of the house.  They involved the same parties, the

12 Toppers.  And, Westport argues, they resulted in the same injury, a

13 home with structural engineering defects.  Even though both complaints

14 lament Heydar's failure to design and construct the Topper residence

15 in a safe and workmanlike manner, the injury question is a difficult

16 one to answer at this juncture because the original complaint

17 contained no recitation of facts and did not specify with precision

18 the defects that were being alleged.  Until the trial of the

19 underlying case has been concluded, it will be difficult to know what

20 injuries resulted from the alleged negligence.

21     But the injury question will not be crucial in every case.  The

22 Bay Cities court stressed that the question of whether "related" is

23 ambiguous is a case-specific one.  "The proper question is whether the

24 word is ambiguous in the context of this policy and the circumstances

25 of this case."  5 Cal.4th at 868.  Though identity of injury was one

26 factor in Bay Cities that rendered related unambiguous, the case does

27 not stand for the proposition that such identity is a prerequisite to

28 finding the term unambiguous.

1       Other courts have found related to be unambiguous in a number of

2  situations.  One example is <u>Gregory v. Home Insurance Co.</u>, 876 F.2d

3  602 (7th Cir. 1989), a case the <u>Bay Cities</u> court found persuasive.

4  <u>See</u> 5 Cal.4th at 872-73.  <u>Gregory</u> involved a lawyer's various actions

5  in connection with the marketing of a videotape investment program.

6  The lawyer drafted a production service agreement and promissory note

7  to be signed by each videotape buyer.  He also drafted a tax and

8  security opinion letter for his client advising that the videotapes

9  were not securities and that buying the tapes would give the buyers

10  tax advantages.  876 F.2d at 603.  Claims were made against the lawyer

11  by the buyers, alleging that the opinion letter misstated the tax

12  consequences of buying the tapes, and by the client, alleging

13  incorrect advice regarding the securities status and tax benefits of

14  the tapes.  <u>Id.</u> at 604.  The Seventh Circuit found that the claims

15  were related under the lawyer's insurance policy, which provided that

16  "Two or more claims arising out of a single act, error, omission or

17  personal injury or a series of related acts, errors, omissions or

18  personal injuries shall be treated as a single claim."  <u>Id.</u>  In so

19  doing, the court upheld the district court, who had found that

20  "Gilbert's letter is but a written version of his advice that,

21  structured this way, the offering was not a security."  <u>Id.</u> at 605.

22  Thus, even though the different claims in <u>Gregory</u> involved different

23  claimants, the Seventh Circuit found that all the lawyer's actions in

24  connection with the videotape offering were "'related' in any

25  meaningful sense of the term."  <u>Id.</u> at 605-06.

26       Another case in the <u>Gregory</u>/<u>Bay Cities</u> line is <u>Continental</u>

27  <u>Casualty Co. v. Wendt</u>, 205 F.3d 1258 (11th Cir. 2000).  That case

28  involved yet another lawyer's connection with K.D. Trinh, a company

1  that sold promissory notes to investors through agents.  Id. at 1259-

2  60.  In 1996, the lawyer was sued in a class action by K.D. Trinh

3  investors for giving inaccurate legal advice, and for making false and

4  misleading statements regarding the legality of K.D. Trinh investments

5  as securities.  Id. at 1260.  In 1997, one of the agents who had sold

6  K.D. Trinh's notes sued the lawyer for making misrepresentations about

7  the investments' legality.  Id.  The lawyer's insurance policies had

8  relatedness language as follows:

9        Any claim or claims arising out of the same or related

10        wrongful acts, shall be considered first made during the

11        policy term in which the earliest claim arising out of such

12        wrongful acts was made.

13  and

14        the limit of liability stated for "each claim" is the

15        maximum we will pay for all claims and claim expenses

16        arising out of, or in connection with, the same or related

17        wrongful acts.  All such claims whenever made, shall be

18        considered first made during the policy term in which the

19        earliest claim arising out of such claim and related

20        wrongful acts was made, and all such claims shall be subject

21        to the same limit of liability.

22  Id. at 1260-61.  Even though the claims involved different types

23  of acts that caused different harms to different people, who had

24  different causes of action against the lawyer, the Eleventh

25  Circuit found that the acts were all related.  The acts were all

26  part of a course of conduct and all were aimed at the same goal,

27  to encourage investment in K.D. Trinh's notes.  Id. at 1264.

28

1   The case at bar does not fit neatly into any of these other

2   cases.  However, what these cases show is that claims can be found to

3   be related under many different circumstances and for many different

4   reasons.  There is, of course, some limit.  The Bay Cities court

5   cautioned that not every logical relationship could satisfy the

6   relatedness test.  "At some point, a relationship between two claims,

7   though perhaps 'logical,' might be so attenuated or unusual that an

8   objectively reasonable insured could not have expected they would be

9   treated as a single claim under the policy."  5 Cal.4th at 873; see

10  also Gregory, 876 F.2d at 606 ("At some point, of course, a logical

11  connection may be too tenuous reasonably to be called a relationship,

12  and the rule of restrictive reading of broad language would come into

13  play.").  But the structural engineering claims here are so related

14  that these concerns do not come into play.  Any claims involve the

15  same parties, Heydar and the Toppers.  The claims involve the

16  construction of the Topper house and the structural makeup thereof.

17  Moreover, the claims were made in the same lawsuit with the same

18  parties.  Given these circumstances, as well as the original

19  complaint's broad language regarding engineering, design, and

20  construction defects, it could hardly come as a surprise to Heydar

21  that the structural engineering claims in the amended complaint and in

22  the original complaint will be treated as a series of related wrongful

23  acts.  Thus, the acts should be treated as one claim under Condition

24  J.  The structural engineering negligence claim was first made at the

25  time of the original complaint.

26

27

28

## IV.   CONCLUSION

Heydar is not entitled to coverage under the 2000-01 policy because he did not report the claim during the reporting period and the notice-prejudice rule does not apply.   Furthermore, Heydar is not entitled to coverage under the 2001-02 policy because no claim was first made against Heydar during the 2001-02 policy period.   This conclusion is based on two alternative bases: first, there is only one claim against Heydar because the Toppers assert only one primary right, the right to a residence designed and constructed in a safe and workmanlike manner; or second, the claims are related such that they are treated as one claim.   As Heydar is not entitled to coverage under either policy, Westport has no duty to defend him in the underlying lawsuit.   Accordingly, Westport's Motion for Summary Judgment [17] is hereby GRANTED.


IT IS SO ORDERED.


DATED: _____1/7/04_____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE